May it please the Court, Bobby Birchfield for the Republican National Committee. I reserve five minutes for rebuttal. The most compelling reason to vacate this 28-year-old consent decree is not its long duration. Although, as the District Court found, the Civil Rights Division does now impose an eight-year limit on similar decrees. The most compelling reason is that for the last 20 years, the RNC has been precluded from engaging in Election Day ballot-watching activities, poll-watching activities, at a time of monumental legal and factual change in the American electoral landscape. In 1993, Congress passed landmark legislation, the National Voting Registration Act, which not only made registration easier, but for the first time imposed five-year criminal penalties on knowing and willful voter intimidation, the very thing this decree is supposed to address. In 2002, Congress enacted the Help America Vote Act, HAVA, which guaranteed the right of any voter who shows up at the polls to cast a provisional ballot. And in 2002, Congress also enacted the Bipartisan Campaign Reform Act, which radically changed the way political parties fund their operations. At the state level, the last three decades have seen radical changes in absentee and early voting procedures and a revolution in voting technology. Rare today is the punch card ballot that we observed with such awe in Florida in 2000. All these changes have made Election Day observation more important than ever. Yet even as modified, the decree deters the RNC from engaging in poll-watching activities and it had that effect in the most recently concluded election. In refusing to vacate the decree, the lower court committed material legal errors. It made and relied on clearly erroneous findings of fact, and it misapplied its discretion in extending the decree for eight additional years, for a total of 35 years. Rather than narrowing the decree, the court expanded it, not just in time, but it expanded it from application primarily to Election Day ballot-watching activities to voter registration activities, even though the record in the case indicated that there were numerous convictions of persons affiliated with ACORN and other organizations that had been engaged in rampant registration fraud in the last several years. Now let me focus, if I may, first on what my client believes are the material errors of law. We are under an abuse of discretion standard here, and I believe we meet that on this appeal. First, the lower court misstated the standard for reviewing consent decrees. The lower court incorrectly required the RNC to show either that what was prohibited by the decree had become legal, or that what the decree required is now prohibited by law. That isn't the standard. As this court made clear in the Brown v. Philadelphia Housing Authority case, there need not be a conflict between the legal changes. Rather, a significant, quote, a significant change with no attendant conflict constitutes sufficient grounds for vacatur, unquote. Under Rule 60b-5, a party may be relieved. It has to be relevant. It has to be relevant, Your Honor, and I believe these changes are, both factual and legal changes, are definitely relevant to this decree. Relevant in the sense that it imposes a burden that was not anticipated at the time. Well, Your Honor, I would argue that the decree and the Supreme Court said this six times in the Rufo case, under Rule 60b-5. The changes, the application of Rule 60b-5 must be flexible so that it's inequitable to continue applying the decree. In the decision by this court in the Building and Construction Trades Council case, which Judge Schloverter wrote for the court, it listed a number of important considerations, and those include the length of time since entry of the injunction. Here, 28 years, remarkable legal changes, many new voting technologies, and a material increase in the proportion of minorities that are comprising the electorate that goes to the polls each year. How are you defining that? I'm sorry, defining? I said, how are you defining that? Defining? You just made a statement. What is the justification for the statement? Your Honor, I think the justification in terms of length of time since entry of the injunction speaks for itself. You just made a statement about minority participation. Your Honor, the statistics that we submitted in our 28-J brief, which have come available, indicate that in comparison to the 1984 presidential election to the 2008 presidential election, minority participation increased, I believe, by about four percentage points of the electorate. I think maybe he was also asking, how do you define minority? Was that part of it? No. Statistically, that's a subset of the question, but statistically, you began to answer it. I thought that Judge Debevoise, in his opinion, stated that the increases that you had alluded to in your papers were really, he didn't say misleading, but off because the absolute increase in the numbers of minorities participating is consonant with the just larger minority population. I think one of the quotes was that the Hispanic vote went up 229%, while the Hispanic population went up 229% and so forth. Your Honor, that's exactly our point. As this component of the population becomes more important, it would, as Mr. Giuseppe Act, the former chief counsel of the RNC said, it would be political suicide for the RNC to do things that would alienate minority voters. We've seen in our lifetimes a change in the approach that both parties have made to minorities. When I was growing up, the South was solidly democratic, and that has changed considerably both in the outreach to minorities and in the composition of the state elected bodies in the South. But there obviously have been instances where it might seem that there should be outreach to particular groups, yet the opposite has occurred. And obviously, Judge DeVos took that into account in his opinion. Your Honor, to the contrary, if I may, the world-renowned expert in voter suppression, Dr. Chandler Davidson, called by the DNC as its first expert witness, testified that he was not aware of any RNC involvement in voter suppression activities since the two incidents that led to the entry of this decree in 1982 and 1987. Judge DeVos, recognizing, I believe, that sparse record, re-invoked the Malone decision from 2004. And the Malone decision was vacated by this Court sitting in bank, specifically citing Munsingware, because Ms. Malone voted on election day, and it became moot. The parties at the district court level then dismissed the complaint, again pursuant to and citing Munsingware, pursuant to this Court's in-bank instructions. The Malone decision is not binding, it has no presidential effect, and we submit should not be considered. But that record is part of the history of this case, and it was reintroduced and discussed by experts in the underlying proceedings. Your Honor. So why was it impermissible for the district court to rely in part on Malone? Your Honor, for two reasons. The first is, Judge DeVos, going into the trial, instructed the parties not to revisit these issues, and so we did not. And we believe that instruction was consistent with Munsingware. And number two, if it is inappropriate for the parties to continue litigating the case as that case, how is it any more appropriate for us to delve into those factual disputes in a later case? Let me ask you a question about your change in the law argument and discussion. Has there been any change in the law specifically addressed to the propriety of voter caging efforts? I'm sorry. Say it again. Has there been any change in the law specifically addressing the propriety of voter caging efforts? Of voter, did you ask about voter caging? Your Honor, yes, in fact. In the National Voter Registration Act, the Congress specifically authorizes the use of mailed, of mailings to determine if people are still resident in the jurisdiction. So federal law actually, which statute is that? That's the National Voter Registration Act, and we cite that in our brief in a footnote. In the reply brief, it is explained in some detail in footnote 10 on page 20 of our reply brief. Thank you. Your Honor. Can we utilize the procedures provided for in this consent decree in order to do that? Since that statute was... Your Honor, as Judge Debevoise found, the consent decree has become unworkable with the 20-day preclearance provision. He reduced it to 10 days. We contend that that's still unworkable because many states have registration deadlines that are after even the 10 days. And, in addition, many of the irregularities that come up during... The answer to my question is no. The answer... We have not. No, Your Honor, we have not. We have not gone through the process. How about the Sentinel Trust case? Doesn't our Sentinel Trust case say that when you, two parties have an opportunity to litigate, fully litigate factual issues, and there is a subsequent... voluntary agreement not to have a final judgment, that those... collateral estoppel still applies to those facts? Your Honor, that would be true as to the 1982 and 1987 issues. Those consent decrees were entered, as you know, without any admission of wrongdoing. But even if you go back to 82 and 87, those are the last instances of litigation on this can be made. And, in addition, Your Honor, I would suggest that Rule 60b-5 specifically envisions the prospect of parties coming back after they've reached an agreement to enter a consent decree. If it is... If prospective application is no longer equitable, as the rule says, then the consent decree can be vacated. There are two other... Did you have another... There are two other aspects to the decision Judge Sloboda wrote that I wanted to talk about because I do think they have bearing here. And those two other aspects are that whether the party subject to its terms has complied or attempted to comply in good faith, and the RNC, I submit to you, has attempted to comply in good faith by avoiding poll watching activities for 20 years with no violations found. And the third factor, the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction. Since this consent decree was entered, as I said earlier, there is now a criminal penalty for the activities that are covered by the consent decree, plus the RNC's no-tolerance policy that was discussed at the trial court. Would you explain, because you mentioned the pre-clearance problem that was reduced from 20 days to 10 days. What is it about the pre-clearance that you find objectionable? There are two problems with it, Your Honor. The first is the duration. It's unworkable. The electorate, the electoral patterns change very, very quickly. As you know from just reading the popular press, it's even more dramatic if you look at the internal polling of the parties. The second issue is we are... Of course, we can't do the internal. Well, the internal polling, the parties, as you know, do internal polling on a nightly basis in the close races, and sometimes they get closer, sometimes they get further away. The other point and more fundamental point is that for the RNC to come in and essentially provide its assessment of the key races at that point in time and to tell the DNC, as we're required under this pre-clearance procedure to do, that's a serious violation of the political strategy, and in fact, the DNC proposed that this be done on an attorney's eyes only basis, which Judge Debevoise did not adopt. Yeah. I don't understand why he didn't adopt it, since you both agreed. Is that acceptable? Wait a minute. Wait a minute. I don't know that we've established that you asked... I couldn't find in the record where you asked the judge to do that if he were going to make a modification. Did you express approval of an attorney's eyes only provision? Well, Your Honor, we primarily advocated vacating the decree and we advocated modifying it by eliminating the pre-clearance procedure. The DNC's rejoinder to that was, don't eliminate it, just make it attorney's eyes only and reduce it, and the district court did not even go so far as the DNC had proposed. That's our point. My question was whether you... We did not... We did not... You didn't take a position on that. Correct. That's our third alternative. We did not advocate that the court adopt it. Help me with... I'm sorry. Go ahead. Go ahead. On a more basic... Oh, no. I just wanted to answer that question. Oh, okay. Okay. Is that acceptable to the RNC? In other words, if the decree were modified to say the pre-clearance statements were attorney's eyes only, is that acceptable? Your Honor, it would be a help but a minimal one. It does not eliminate the timing issue. But you set the timing issue being the 10 days... Correct. But if it were for attorney's eyes only, would that make a difference? It would reduce the concern about delivering the political strategy to the other side. It would not reduce the impracticability for those states that have later same-day registration or registration that's allowed within the 10 days, nor would it help us with regard to the late-changing electoral environment, which might call to our attention issues within that 10-day time frame. And so what time frame would be acceptable? Your Honor, we... Our position has been... You want it taken out. Exactly. Yeah. But as a stopgap, what would be acceptable? Your Honor, I don't have... Our position on that is that we think any advanced notification would be difficult, but the shorter the better is, I think, the only answer I'm prepared to give you on that right now. Well, how much shorter than 10 days? Two days, three days. I mean, we're talking about it... But I wanted to get to this point. Yeah, go ahead. We're talking about a situation here where we have a dynamic electoral environment, and things do change right up until the last 24 hours or 12 hours before the polls open. Okay. I interrupted just saying... Go ahead with your question. I want to go back to talking about Malone and about collateral estoppel and that sort of thing. On a more fundamental level, help me. We're... I think we're in agreement that under RUFO and BCTC, you've got to show in order... You have the burden of showing a significant change in law or facts warranting that revision or that the decree has become unworkable for unforeseen obstacles or enforcement without modification would be detrimental to the public interest. And we're talking about a judgment here of the court. Do we get to whether there's been... the decree? It is one of the... If it's not sufficient, can we agree that as a matter of law, it's not sufficient for somebody to come into court who's the subject of a judgment and say, Your Honor, vacate this judgment because we've complied with it for 20 years, and so vacate it? I'm not... If you don't show change, you haven't got a basis for vacating the judgment, right, or modifying it. Your Honor, I will provisionally agree with that in this respect. I'm not aware of any case where the only factor the court looked at was the time. But the timing is one factor that's explicitly set forth in the Building and Construction Trades Council case that I mentioned a few years ago. Judge Slover particularly wrote, whether the party subject to its terms has complied or attempted to comply in good faith. In the SEC v. Warren case, there were other factors, but certainly Mr. Warren's compliance with the consent decree was a major factor in driving that decision to vacate that decree. As presider, I have the unpleasant duty to tell you the red light is on. Okay. You saved a lot of time for rebuttal, and we're not the Supreme Court, so among other things, we don't require that your rebuttal be limited to that which your adversary says. I appreciate that, Your Honor. Thank you. All right. Mr. Genovese, is that? Genovo. Good afternoon, Your Honors. I may please the court. Angelo Genovo on behalf of Appellee Democratic National Committee. Your Honors, we oppose Appellant's motion to vacate, and we ask the court to affirm the trial court because the trial court did not abuse its discretion in denying the RNC's motion to vacate and in granting its motion to modify, and I'd like to highlight that. The application made- He gave a lot of reasons, and he does in his brief even more, which we, of course, have read, as to why it's time to put this to bed. Why is he wrong? Well, he's wrong for several reasons. First of all, he's wrong on the facts and whether or not there are any factual changes that would warrant a change, and he's wrong on the law. Okay, let's- Let me deal with the first issue, which he characterizes the most compelling reason is because the Republican National Committee has been precluded from engaging in normal poll-watching functions, and the answer, Your Honors, resides on the face of the consent orders themselves, which haven't been given as much attention as one might otherwise give, but I would like to get the Court focused on it. The consent orders itself, the 1982 consent order, which is in the appendix, reserves expressly to the Republican National Committee and the Republican State Committee in New Jersey the opportunity to avail itself of state laws which permit it to engage in poll-watching functions, and I might point out to the Court, in my home state of New Jersey, I believe it's at NJSA 19-13-15, but there's a specific law which talks about poll-watching functions. So at its inception, the consent decree, a provision that Judge Debevoise did not modify, preserves expressly the opportunity to both parties, and particularly the RNC, to avail itself of those laws. And that's- I think he said in explaining what it means in this latest opinion- He offered clarity. And he offered clarity, Judge Slover, for the simple reason that any wounds, any concerns that are advanced here today or advanced here below, have been self-inflicted. They have been misinterpretations that the Republican National Committee has chose to abide by without seeking preclearance for the 20-odd years that they would otherwise have had an opportunity. They've been self-imposed in terms of their interpretation. Your Honor asked, you know, what are the reasons why sitting here today, 27 years later, should this survive? Because the viability and the validity of this consent order is revived with each election. And it should survive because the Republican National Committee agreed to it. And it should survive because they consented to it. And it should survive- But they say that things today are different than they were then. Well, let's test that. Let's test that. First of all, as Your Honor noted in the Building Trades Council case, one of the things that you consider is unforeseen circumstances. Well, let's go back to the consent decree. The consent decree on its face says in paragraph 2, and I'm reading from it, the RNC and the RSC, hereafter collectively referred to as the party committees, agree that they will in the future in all states and territories of the United States. They've embraced the notion that there is a fluidity to the change in the law. Let's start with that premise. Now, what are these changes in the laws that they suggest? I think a question was posed by Judge Stapleton that goes to the core of my argument in that regard. The laws that they cite to, the laws that they cite to, BICRA, the Bipartisan Campaign Reform Act, HAVA, the Help America Vote Act, the National Voter Registration Act, our motor voter law, none of those laws, none of those laws address what is at the heart of this consent decree. This consent decree is about one central theme, in-person attempts to deter voters in person at polling places. Deter and intimidate. Intimidate, Your Honor, correct. To deter and intimidate voters for access to the polling place. These laws, number one, don't address that issue. Number two, the Voting Rights Act itself does not expressly address that issue. Number three, the Carter-Baker Commission that they relied upon in their application itself in 2005 invited a need to change the law. The law has not been changed to address this issue. It is now more than ever a necessity, if necessity is a standard, and I would suggest to Your Honors it's not a standard, but now more than ever that this law, this consent decree, retain its viability. Going to a point that Judge Greenaway made, the question is apt. What Judge Debevoise understood was that any increase in minority voter participation, something that we should welcome in this nation, any increase in minority voter participation was a function of population growth. Why would we think that a consent decree that is designed to ensure that participation and avoid barriers to access to the polling place as the minority populations in this nation grow, as their participations grow, why would we think that that would not have any relevance today? It strikes me that the argument that's advanced by counsel below and advanced here today tries to juxtapose two very different things, the concept of voter fraud, which the record below makes clear is an exaggerated concept, and the concept of voter suppression and of minority participation. Ne'er the twain shall meet. Ballot security measures which have the purpose or effect of deterring minority voter participation are not the antidote to voter fraud. That is the premise of their claims. That is the premise of their changes. It shouldn't be accepted by this Court, just as it was not accepted by Judge Debevoise. Your Honors, the RNC is very much required to meet a burden here, and they've attempted to meet their burden in ways that, quite frankly, we would deem in part offensive and other ways desperate. Judge Sloverter, you asked me, you know, what are these purported changed circumstances? What really did they argue? Well, the first thing they argued, and I want to speak to this, was that they have not violated the decree. Judge Debevoise was well within his discretion to look to Malone, and if you look at the Munsingware case, it's telling, and let me draw some distinctions first of all. Munsingware was about the res judicata effect of an order. As Judge Sloverter in your question noted, this was a fact finding in what, in effect, was an application to enforce an intervener's rights once the intervention was permitted. Judge Debevoise made fact findings. Those fact findings became part of the record of this case. Now, interestingly, in Munsingware, the Court talks about a situation where, in that case, the United States sat on its rights when it had the opportunity to make an appeal. Now, the joint stipulation of dismissal to which Mr. Birchfield refers, which appears as Docket Entry 37 in the record in this case, was a joint stipulation for dismissal. Now, a couple of things happened. When, after the grant of the en banc hearing by the Third Circuit. Yeah, excuse me. Let me ask you about that. Yeah. The en banc hearing overturned a panel order. I don't want to talk about it if it's not a matter of public record. No, it is, Your Honor. What transpired was the sequence of events. I wrote a dissent, right? Correct. I was very much part of that, so I know about that. What happened, Your Honor, is that an application was made to stay Judge Debevoise's preliminary injunction. That preliminary injunction enjoined the use of the Ohio caging list. It went before Your Honor. Your Honor denied the stay. Yeah, it was a two-to-one decision. Correct, correct. Judge Fischer went the other way. Right. The deny guard went with him. Right. You denied the stay. Then the matter went up that a request was made for an en banc review. Which we did by phone late at night. Then what also happened is Ms. Malone, the applicant. She voted. She voted. Before she voted, they took it to Justice Souter. Justice Souter, who determined that it was moot. That it was moot because she had just learned that she had voted. Then it went back to the circuit, and the circuit remanded it. Remanded it. I didn't remember that. To Judge Debevoise with a specific direction. With a specific direction that left open the question as to whether or not the parties wanted to litigate under any of the issues under the consent decree. Then what happened a month later on that invitation, the parties entered into this joint dismissal. And that joint dismissal made specific provision that the parties reserved in themselves the right in the future to raise issues associated with the consent decree. The RNC had that in 2004. They made no application. They knew of Malone in 2004. And Monsignor tells us that the litigant that sleeps on his rights is not entitled to assert the vacator in the way that is sought to be asserted here. But isn't it obvious that it's a long time ago that that consent decree was entered and there have been just all sorts of changes, maybe not directly involved. But, you know, the context is different now, isn't it? Well, I suppose. It's a long time ago. Well, first of all, temporal considerations are by no means, and I think, Your Honor, you've said that in a variety of opinions. You've said that in BCTC. You read more than I do. Go ahead. But temporal considerations are not controlling, number one. Number two is this is elections occur in cycles, presidential every four years. Yeah, but they point out we have a minority president. We have an attorney general. And what does that tell us, Judge Schultz? Is that evidence of a changed circumstance? Because an African-American serves as our president, they would have you believe that he's going to engage in stricter enforcement of our voting rights laws? Or that because Eric Holder is an African-American, is that what drives those judgments? Is it because Michael Steele is the political leader, or was up until a week ago, the Republican National Committee, that they're not going to have an interest any longer in suppressing minority voters because it's clear and it's been clear, and Justice Kennedy told us this in Bartlett v. Strickland, that it's clear that racial polarization in voting still occurs. Have you asked for a hearing, a factual hearing before Judge Debevoise? Judge Debevoise. From the opinion that's up, the order's up before us now. Was there a factual determination about whether there's been any change? Absolutely. Judge Debevoise, first of all, has presided over this case for 30 years. And I believe in some of your decisions, you've indicated that special deference might be accorded to a jurist who has had that intimate understanding of the underlying litigation. This judge, Judge Debevoise, has seen every pleading, every application, every motion, every argument in connection with this case. He understands its context. He understands its history. Now, he conducted, and I believe it was at the request of the Republican National Committee, a two-day plenary hearing. We had a trial. He took in thousands of documents. We produced three witnesses. They produced one who I might suggest was self-serving, having served as the general counsel to the Republican National Committee, who, by the way, Judge Sloviter, acknowledged that the Voting Rights Act has not changed in a manner to address what the core purpose is. The caging issue? The caging issue. It has not changed to affect that change. There is ample evidence, ample evidence in this record that supports the notion, Your Honor, that Judge Debevoise did not abuse his discretion in reaching the conclusions that he reached. Why is eight years necessary? I think he said it would come up again in eight years. That's a long time. Well, we don't know. Well, first of all I mean, there will be several, there will be an election in two years that may be a pretty hot election. Why shouldn't, if this were to continue, why shouldn't it see what happens in two years, see if you can produce any evidence that there's still intimidation? Why shouldn't you Let me deal with each of those concepts, if I might, Judge Sloviter. The first concept is the idea that the absence of proof that a voter was deterred is somehow a suggestion the mission has been accomplished. I reject that assumption. Well, how can that be shown then? Well, the fact that there has not been, the fact that there's not been a need for these applications to, like the Malone application, strongly suggests that the very purpose of the consent decree is being realized. Now, let's talk about time. He says they're deterred. Well, let's take, well, he's deterred by his own self-initiation. If he chose to put handcuffs on, I don't, the key to his handcuffs resides in the consent order. The Republican National Committee has chosen not to abide by the very terms. They've chosen not for 27 years to seek preclearance. They've chosen not to make application. They rejected an offer. They abandoned an offer that we made in this litigation to modify, to comport to his request. And it strikes me, it strikes me, Your Honors, that we're sitting here today when they made an application to vacate and modify, and they turn around and say, well, we got half a loaf. We want more. But let me deal with your question. Eight years. Why eight years? Well, first of all, they agreed to it. Not once, Judge Sloviter, but twice. They agreed to it in 1982 without duration, and they agreed to it again in 1987 without duration. And we know in these 60B cases that when parties consent to a decree, with some of the finest lawyers in the nation, I might add, to a decree, they knew what they were agreeing to. You can take that to the bank. The second point, Your Honor, is the eight years, the eight years corresponds, corresponds to the Department of Justice approach to these things. I think it's rational. It's reasonable. But he says five years. Didn't he say that now they're all limited to five years? Your Honor, I believe Mr. Birchfield said eight, and, Your Honor, I know Judge Debefois said eight, and I believe the DOJ did too. That's a long time. Go ahead, Walter. It's two presidential election cycles, Your Honor. Help me with this. I realize that you can make an argument that the RNC has not been in any way prejudiced or harmed by this extension. Before the extension, they were subject to an in perpetuity restraint that they agreed to that they could get out of whenever they could show a relevant change of circumstances. And after the order, they could, they were actually in a better position. They could get out of their in perpetuity restraint at any time that they could show, carry their burden of showing change, or if the Democratic National Committee carried the burden of showing violations, then it would extend beyond eight years. And I think that, logically, that's a pretty tight argument, that they're in a better position now than they were before this order came in. I would think so. There's now a cutoff. Judge Debevoise found that the continued operation over this without limitation was inequitable, quote unquote. And having found that the status quo was inequitable, he said, I'm going to look to the way the DOJ handles these things, and he looks and he adopts an eight-year rule that the DOJ applies to the maximum limit of a restraint. And if you apply an eight-year rule as the maximum limit on a restraint, this should have been vacated in 1990, and it was not appropriate because they hadn't been asked in 1990, but at least they ought to have stopped it now. What do you say to that? Well, I say a couple of things. One is that the starting point is that it's for the trial court and the exercise of discretion in applying the 60B-5 standard, which I think is the focus here, to consider equitable factors. And I think what Judge Debevoise did is he looked at Malone, he looked at its recent vintage in a relative sense. It was one, one-and-a-half presidential or two presidential election cycles going back. He found safe harbor in the Department of Justice's view of such things. I think Your Honor is correct that now we have an endpoint, and there's nothing in his opinion that forecloses an application, quite frankly, tomorrow if there are changed circumstances, and I don't believe they're foreclosed from making that application. If I might close, unless there are other questions, it is clear that. . . It's not irrational to apply, to look to a rule that is a maximum restraint of eight years. Well, I don't. . . Prospectively? It's been in effect for 20, 30 years. Well, let me answer that directly. I don't believe it is irrational given. . . Let's focus on what the rule is and its seriousness. One of the things, with my 48 seconds to go, one of the things that the RNC focuses on is this whole notion of voter fraud. What this consent decree is about is in-person, in-person participation. There are many, many means in creating, including the criminal penalties, to deal with situations of voter registration fraud and filling out of absentee ballot fraud, and in fact, below, the RNC argued that those were insufficient, by the way. Today, they're arguing it's sufficient. But below, they argue they're insufficient. So let's start with the in-person voting fraud and the narrow constraints of the order. It is not irrational or unreasonable in the face of all the other factors to extend this by eight years given the 2004 Malone event and given the fact that racial polarization as recently as the determination in Bartlett v. Strickland still exists in our society. And for those reasons, the RNC has utterly failed to satisfy its burden, and we ask the Court to affirm the decision below. Thank you. When you were here a few minutes ago, there was a question put to you by one of my colleagues with regard to what should the clearance time be. It's now 10 days under Judge Debevoise's order. And your response was, I really don't have a good answer. I'm paraphrasing. I'm sure you put it more eloquently than that. But, you know, two or three days. So my question with regard to the entire set of modifications that Judge Debevoise has incorporated into his opinion is are you taking the stance for the RNC that this is an all-or-nothing proposition, that your position is vacate, or are you taking the stance with us that, you know, there are obviously several instances where there are modifications. Some of them are time-sensitive. Some of them are not. And you want to, on behalf of your client, talk about some interim timing issues? Because I want to be clear on that. The question was posed, but I don't want that to be part of our consideration if that's not what your focus is. My understanding of your focus is it's vacation. Very fair question, Your Honor. And I would say our principal, as you know, our principal argument is that this decree has survived long enough and should be vacated for all the reasons we've set forth. If this Court, in its discretion, believes that it needs to be further modified, then among the modifications that I would suggest the Court look at are reducing the time of the preclearance procedure to two or three days, if not eliminating it entirely, because it does create a number of workability issues by its very nature. Second, if the decree is going to be extended for an eight-year term, the pertinent, and we believe that's not appropriate, but the pertinent touchstone baseline for extension at the very latest would be the 2004 Malone decision. So eight plus 2004 would be 2012, which would allow the RNC to participate more fully in the next 10 months. How do you have standing to make this argument? I mean, what do you say that you're in a better position after Judge Debevoise entered his order than you were before? You can make an application tomorrow, file a paper, and say we want to come into court and demonstrate that there's been a material change that has changed the burden under this statute, under this decree. And now, unless you showed that, carried that burden, you had agreed to perpetuity. Now, the judge says, well, we're going to have a set end unless they carry the burden of showing that you're not complying. Now, aren't you in a better position after he entered that order than you were before he entered it? Your Honor, we are in a better position, but in the same way that a plaintiff who seeks $100,000 in district court is in a better position if he recovers $50,000. He can still appeal the remedy, and the remedy that we proposed is complete vacatur or modification. And the modification that we got below, it moves to some degree in the right direction, and I want to come back to that in a second, but not, we believe, rationally and in an appropriate use of discretion on this record. Now, there were components of this decree that have moved the ball in the right direction, but the addition of eight years from 2009 we disagree with, and we also disagree with the expansion of the decree. Several times my colleague here, Mr. Genova, referred to the point of this decree is in-person intimidation of voters. This decree is now expanded for the first time in 27 years. It's now expanded to cover registration. Pardon me? You mean by the definition? The decree has been expanded, and let me read you. In what? In defining? That's what I'm just trying to find out. How has it been expanded? The decree now defines ballot security as used in the consent decree. This is on appendix page 4, paragraph 3 of the revision, where there's the long definition of ballot security. Ballot security as used in this consent decree shall include any program aimed at combating voter fraud by preventing potential voters from registering to vote or casting a ballot. That's an expansion. I have a question on that. What activity would you like to pursue that may fall within what you say is a gray area regarding the definition of ballot security programs? The principal problem that I, as an attorney who often advises the RNC about this decree, confronts is the decree says that it refers to any activity that, and I'll try to find the precise wording for you, Judge Sloboder, any activity that has as one of its purposes the potential for combating fraud. Well, what do you want to do that you are precluded from doing? I just can't understand. The RNC would like to, both in its own behalf and in consultation and collaboration with the state and local parties, have a process for placing knowledgeable and well-trained poll watchers at the polls on election day, particularly in precincts where we think there are going to be issues. But you can't do that. As I understand his modification of poll watching, you can do that. We can do that, but if any part of that effort, if any part of that effort is related to detecting fraud, then it violates the decree. Well, fraud was not the issue in this case. I'm sorry? I don't think fraud was the issue in this case at all. Well, that's, but the decree is written such that even if our people are standing there doing nothing other than writing on a piece of paper and handing it to the voting supervisor that this particular person is a well-known whatever, felon, well-known not to be registered in this district, has already voted three times today, if our guy does that, he's violated the decree. Well, so here's my question. Normal poll watch function is defined as stationing individuals at polling stations. We agree that's what you want to do. Correct. Right? Okay. To observe the voting process, you want to do that. Correct. And report irregularities. Correct. Okay. So it seems to me that the critical issue from your client's perspective is the next part of it, unrelated to voter fraud. You want it to be related to voter fraud, and that's the crux of your problem. We don't want it to be precluded simply because one aspect of reporting irregularities might be reporting voter fraud, not just by a voter but by an election official. It is written in such a way, and I would ask the court. The silence may indicate that the panel doesn't quite understand what you're getting at. And let me try to help, and I appreciate the issue. But I would ask you to put yourself, as you consider this issue, to put yourself in the position of an attorney in-house or outside advising the RNC on how they position people at polling stations in the future within the context of this decree. Do they specifically tell them, if you see voters voting multiple times, you've just got to bite your tongue and not do anything about it? I think that's what this decree means. Or go have your plan approved. But you go back to the issues of the preclearance procedure there. If we know sufficiently in advance where the issues are going to be and can put our people there and don't mind disclosing our strategies, Election Day strategies, to the opposition, yes. But that goes back to some of the procedures you proposed before. What's the big strategy when you're talking about putting people in the polling place? You know, it's hard. I mean, I vote every election. I don't know if we've had any. I mean, where I come from, it's not a problem. But I don't know. What is this? If the issue is whether or not you tell poll watchers that they have got to limit their activity to poll watching or they are authorized if they see voter fraud going on to report it, if that's the issue, how is it a strategy disclosure if you decide you want to tell the people who are poll watching that they should look for fraud also or they can look for fraud also and you go to the court and you say this is our plan, approve it? What great strategy has been disclosed in here? Well, there are two answers to that question, Your Honor. The first is it is not possible for us to have poll watchers in every precinct and for the RNC, which is the national organization, to be involved. It involves strategic decisions about where we think the most important precincts are going to be, good and bad, to protect, you know, to make sure that the people, the precincts where we expect a heavy turnout for Republicans, those people are not bothered in voting and in the precincts where we think the opposition is going to be strong to make sure that things are on the up and up in those precincts. That's the first answer, so that there are strategic considerations. And the second answer is if our instructions to the people are to go to the polling places, if we are telling them they can go to the polling places and they can do everything but they can't report fraud or they can't do anything about fraud, which is what this order currently says, then it eliminates one of the important reasons why you have ballot observation. I mean, I've done ballot observation. I'm sure you have, all of you have as well. I've done it nationally and internationally. And one of the things that breeds confidence in the electoral process is when you have a transparent process and you have people there on both sides to observe. Obviously, Judge Debevoise is concerned, as he drafted it, with the crux of the matter, and that is voter intimidation and the thin line between reports of voter fraud and voter intimidation. And that's now subject to a five-year criminal penalty, Your Honor, which was not in existence at the time this decree was initially entered. That was initially added in 1993 in the National Voting Registration Act. But you haven't gone to Judge Debevoise and said, please, like Judge Stapleton asked you, please modify this to permit X or to permit Y. Well, you have a do's and don'ts list right now based on what Judge Debevoise has done. Well, the RNC, because of a judgment it's made that it is too risky to engage in Election Day poll-watching activities, does not engage in Election Day poll-watching activities. I understand that. But you have a do's and don'ts list now based on the modification of what is permissible, based on the modifications and what is not. You just choose not to engage in trying to determine which you should follow and which you won't. We could create a list of do's and don'ts from this decree. You haven't done it yet? Because the RNC hasn't been involved in poll-watching activities. It wasn't in 2010. It leaves that to the state and local parties, which are not covered by this decree. But we could do that, Your Honor. But one of the things on that do's and don'ts list is you have to avoid anything to do with detecting or reporting voting fraud. It doesn't say. And that, again, I would ask the Court to put yourselves in the position of someone advising the RNC on how to comply with this decree. And it seems to me that it is better not to be involved than to have, as we've seen in the last several cycles, election day lawsuits brought under this decree to enforce it, most of which don't succeed. Thank you. I just have one. So at the end of the day, based on what you've just said, vacateur is really what you're seeking and not some sort of internal modification that the panel can come up with between Judge Depp Voice's order and vacateur, right? If you can come up with a modification that meets our concerns, if the Court has in mind modifications that can meet our concerns short of vacateur, we would be amenable to it. And among the things that have been suggested today are reducing the preclearance time or eliminating. Yeah, but you didn't give us any help on that. You just said two or three days. And that would be an improvement. Well, if you haven't given us an improvement, if you haven't given us a principle basis for why two or three days, you know, this would allow us to do X, which 10 days doesn't allow us. I understand it would be better, right? I get that. And you haven't asked Judge Depp Voice to that. Have you asked him for two or three days to modify? We pointed out to Judge – You just asked him to vacate. We did not move for reconsideration of this. We did not move for reconsideration of this order once it was entered. We came directly here. We're happy to have you. And I'm delighted to be here. And there was a comment. You suggested that I was an able attorney earlier. I appreciate that. But these decrees were before my time. I had just finished my clerkship on this court when the 82 consent decree was entered. Your Honor, the eight years, another modification would be eight years counted from the Malone controversy, which we don't think is appropriate. What about from now? How many years from now? That would be two years from now because Malone was six years ago. Okay. Those would be modifications that would help. They're not as good as vacateur. Okay. Thank you. Thank you, Your Honor. You are both able attorneys. Thank you. Off the record, who did you clerk for?